**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

ALVIN D. HALL,                          )
                **Plaintiff,**        )
                              )
v.                                      )        **CIVIL ACTION NO. 2:15-06938**
                              )
CAROLYN W. COLVIN,                      )
**Acting Commissioner of Social Security,**   )
                **Defendant.**       )

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. By Standing Orders entered May 29, 2015, and January 5, 2016 (Document No. 4 and 14.), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the Pleadings (Document Nos. 11 and 12.), and Plaintiff's Reply. (Document No. 13.)

The Plaintiff, Alvin D. Hall (hereinafter referred to as "Claimant"), filed applications for DIB and SSI on March 24, 2014 (protective filing date), alleging disability as of March 12, 2014, due to pulmonary fibrosis, arthritis, and high blood pressure.[1] (Tr. at 10, 173, 174-83, 184-87,

---

[1] On his form Disability Report - Appeal, dated July 24, 2014, Claimant reported that his breathing problems had worsened and that his primary care physician gave him authorization to obtain a handicap parking sticker due to his limited ability to walk and his shortness of breath. (Tr. at 211.) Claimant also reported that he used a wheelchair to get around in the stores, paid someone to mow his grass due to his breathing condition, and that he was extremely irritable and easily agitated. (*Id.*)

200.) The claims were denied initially and upon reconsideration. (Tr. at 10, 51-59, 602, 61-69, 70, 71-79, 80, 81-89, 90, 91-93, 96-98, 105-07, 109-11, 112-14, 116-18.) On October 23, 2014, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 119-20.) A hearing was held on February 20, 2015, before the Honorable Peter Jung. (Tr. at 27-50.) By decision dated February 26, 2015, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 10-21.) The ALJ's decision became the final decision of the Commissioner on April 2, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-5.) Claimant filed the present action seeking judicial review of the administrative decision on May 29, 2015, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2015). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether

the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience.   20 C.F.R. §§ 404.1520(f), 416.920(f) (2015). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because he had not engaged in substantial gainful activity since the alleged onset date, March 12, 2014. (Tr. at 12, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "pulmonary fibrosis, lumbar pain syndrome, hypertension, chronic obstructive pulmonary disease, obesity, and depression," which were severe impairments. (Tr. at 12, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 13, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform light exertional level work, as follows:

> [C]laimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the [C]laimant can lift and carry 20 pounds occasionally, 10 pounds frequently, stand and walk for up to 4 hours in an 8 hour day, and sit for 6 hours in an 8 hour day. This individual can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch and crawl. This individual must avoid frequent exposure to wetness, humidity, and vibration. This person must avoid occasional exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation, as well

3

as to hazards, machinery, and heights. This individual is limited to simple, routine, repetitive tasks and can have frequent contact with supervisors and co-workers and occasional contact with the public.

(Tr. at 15, Finding No. 5.) At step four, the ALJ found that Claimant was unable to return to his past relevant work. (Tr. at 20, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a table worker, laminator, and final assembler, at the unskilled, sedentary level of exertion. (Tr. at 21-22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 22, Finding No. 11.)

<u>Scope of Review</u>

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

A careful review of the record reveals the decision of the Commissioner is supported by substantial evidence.

<u>Claimant's Background</u>

Claimant was born on July 11, 1975, and was 40 years old at the time of the administrative hearing, February 20, 2015. (Tr. at 20, 32, 174, 184.) The ALJ found that Claimant had a tenth grade, or limited education and was able to communicate in English. (Tr. at 20, 32.) In the past, he worked as a mining repair specialist, a general laborer, an installer for water conditioners, and a security guard. (Tr. at 20.)

<u>The Medical Record</u>

The Court has considered all evidence of record, including the medical evidence, and discusses it below in relation to Claimant's arguments.

<u>*Physical Impairments*</u>:

Claimant treated with Dr. Kamel Marzouk, M.D., from March 2013, through December 2013, for treatment of chronic, mild to moderate shortness of breath. (Tr. at 379-96.) Claimant first presented to Dr. Marzouk on March 14, 2013, with complaints of mild shortness of breath on exertion with a three year history, associated with wheezing and cough. (Tr. at 379.) Dr. Marzouk noted a prolonged history of smoking and that Claimant was smoking 31 cigarettes a day. (<u>Id.</u>) Physical examination was unremarkable except for shortness of breath and Dr. Marzouk ordered a complete pulmonary function test. (Tr. at 380.) Spirometry testing on April 11, 2013, revealed FEV1 values of 3.15. (Tr. at 385.) Physical exam on April 24, 2013, revealed normal breath sounds without wheezing or rales. (Tr. at 377.) A CT scan of the chest on May 17, 2013, demonstrated a nonspecific nodule in the right lower lobe that had resolved and was undetectable by August 19, 2013. (Tr. at 382, 388, 391.) It was noted that Claimant had normal spirometry despite submaximal efforts. (<u>Id.</u>) There were no restrictions or significant obstruction. (<u>Id.</u>) A PET scan on June 5, 2013, from the skull base to mid-thigh failed to demonstrate a right lower lobe nodule. (Tr. at 384.)

Claimant had no symptoms on July 8, 2013, and physical exam was unremarkable. (Tr. at 373-74.) The follow-up chest CT scan on August 19, revealed moderately extensive interstitial changes in the lungs that was compatible with interstitial fibrotic disease. (Tr. at 354, 391.) Dr. Marzouk diagnosed interstitial lung disease on September 18, 2013, and referred him to Dr. Hasan. (Tr. at 370-71.)

Claimant underwent a lung wedge biopsy of the right lower lobe on October 8, 2013. (Tr. at 259-62.) The biopsy revealed irregular interstitial fibrosis with peripheral honeycombing and alveolar spaces filled with pigment laden macrophages. (Tr. at 256, 257, 259, 261.) Follow-up exam with Dr. Marzouk on December 18, 2013, revealed bilateral end expiratory wheezing in both lung fields. (Tr. at 367-68.) He diagnosed interstitial lung disease and COPD. (Tr. at 368.) Claimant was advised to stop smoking and was referred to Dr. Kinder. (Id.)

Claimant presented to the emergency room at Logan Regional Medical Center on December 19, 2013, with complaints of shortness of breath and cough. (Tr. at 304-05, 349-50.) Claimant reported his pain at a level 0 out of 10, and it was noted that he was in no apparent distress. (Tr. at 305.) Physical exam was unremarkable. (Id.) He was admitted to the hospital and administered IV steroids and antibiotics. (Tr. at 305-09.) His PCO2 level was 39.8 and his PO2 level was 62.8. (Tr. at 322.) On December 20, 2013, it was noted that he was in moderate respiratory distress but had improved with antibiotics. (Tr. at 309, 311.) Claimant reported that he did not smoke but had a history of smoking. (Tr. at 311-12.) He was discharged on December 21, 2013. (Tr. at 312.)

Claimant returned to the emergency department on January 28, 2014, for pulmonary fibrosis exacerbation, with complaints of shortness of breath, cough, productive sputum, and wheezing. (Tr. at 289.) Dr. Marzouk noted that Claimant continued to smoke, despite his advice.

(Id.) Physical examination was unremarkable and his PCO2 levels were 37.4, and his PO2 was 79.2. (Tr. at 297.) Dr. Marzouk continued his antibiotics, steroids, and breathing treatments and noted that Claimant was "still smoking and as long as the [Claimant] is smoking, his lung condition will get worse." (Tr. at 290.)

On March 4, 2014, Claimant again presented to the emergency department at Logan Regional Medical Center, with complaints of shortness of breath with light activity, and a cough. (Tr. at 267-72.) It was noted that Claimant did not display any signs of respiratory distress, and physical examination, essentially was normal. (Tr. at 268.) An x-ray of Claimant's chest revealed no acute abnormality. (Tr. at 275.) He was discharged after having received antibiotics in the emergency room. (Tr. at 271-72.)

Claimant presented to Dr. Brent W. Kinder, M.D., a pulmonary specialist, on March 10, 2014, with complaints of shortness of breath, dry cough, and dyspnea on even minimal activity. (Tr. at 356.) Aggravating factors included exertion, exercise, climbing stairs, and smoke. (Id.) Claimant reported that he was able to walk one or two blocks on flat surface and one flight of stairs. (Id.) Claimant was working in a machine shop at the coal mines and smoked one to three packs of cigarettes per day. (Id.) Physical exam was unremarkable and Dr. Kinder diagnosed pulmonary fibrosis, arthritis, and interstitial lung disease. (Tr. at 357-58.) He noted that Claimant was oriented and was without anxiety or agitation. (Tr. at 358.) Dr. Kinder advised that Claimant quit smoking, increase cardiovascular exercise, and enroll in a pulmonary rehabilitation program. (Id.)

On March 18, 2014, Dr. Marzouk noted that Claimant was doing well, was less short of breath, and stopped smoking two months ago. (Tr. at 364-65.) Physical exam revealed bilateral equal breath sounds without wheezing or rales. (Tr. at 365.)

7

Ventilatory function testing on June 3, 2014, revealed FEV1 values of 3.14, 3.00, and 2.86. (Tr. at 362.)

Claimant presented to the emergency room at Logan Regional Medical Center on June 16, 2014, with complaints of burning in his lungs after having tried to root dig. (Tr. at 688.) On physical exam, he appeared uncomfortable and rated his pain at worst, at a level six out of ten. (Tr. at 688-89.) His pain was aggravated by increased activity. (Tr. at 689.) Respiratory effort was labored and he had breath sounds with wheezes in the right posterior middle lobe and right posterior lower lobe. (Id.) It was noted that he smoked and did not want to quit. (Tr. at 692.) He was diagnosed with desquamative interstitial pneumonia with exacerbation of symptoms. (Tr. at 693.) PCO2 and PO2 values were 32.6 and 102.6, respectively. (Tr. at 706.) A chest x-ray revealed no acute abnormality. (Tr. at 704.) A chest CT scan on June 17, 2014, revealed nonspecific mediastinal lymphadenopathy and emphysematous changes in the lungs. (Tr. at 387.)

On June 23, 2014, Dr. Cindy Osborne, D.O., a State agency reviewing physician, opined that Claimant was capable of performing light exertional level work, with standing and walking for only four hours in an eight-hour workday; never climbing ladders, ropes, or scaffolds; occasional postural limitations; an avoidance of concentrated exposure to wetness, humidity, and vibration; and an avoidance of even moderate exposure to temperature extremes, hazards, fumes, odors, dusts, gases, and poor ventilation. (Tr. at 55-57, 65-67.) Dr. Osborne noted that Claimant had a significant history of smoking, with occupational exposure in the machine shop at the mines. (Tr. at 56, 66.) She further noted MRI findings of pulmonary fibrosis, emphysema, COPD exacerbation with acute treatment regimen. (Id.) On September 19, 2014, Dr. Narendra Parikshak, M.D., a State agency reviewing physician, affirmed Dr. Osborne's assessment. (Tr. at 76-78, 86-88.)

On July 14, 2014, Claimant returned to the Logan ER, with complaints of shortness of breath. (Tr. at 673.) He symptoms were aggravated by exertion and alleviated by prescription medication. (Id.) At their worst, Claimant's symptoms were mild and unchanged. (Id.) Claimant reported that he smoked one-half pack of cigarettes per day. (Id.) Claimant did not appear in respiratory distress and physical examination was normal with the exception of some mild, scattered wheezing. (Tr. at 674.) Antibiotics were administered and he was discharged home. (Id.) Claimant's PCO2 and PO2 values were 37.5 and 77.0. (Tr. at 681.)

A CT scan on August 11, 2014, essentially was stable, with changes of biopsy-proven pulmonary fibrosis. (Tr. at 670.) On August 19, 2014, Claimant presented to the Logan ER with complaints of passing out and possible seizure-like activity. (Tr. at 649.) On August 19, 2014, Claimant arrived at Logan ER via ambulance after having collapsed and passed out. (Tr. at 642.) He reported that he had a headache and felt dizzy. (Tr. at 646.) He was referred to Dr. Dolores D. Santamria, M.D., for a neurological consultation, who determined that Claimant's syncope was related to hypoxemia and was less likely epileptic. (Tr. at 650-53.) On September 18, 2014, Claimant again presented to Logan ER with complaints that he had passed out in the shower. (Tr. at 608.) His medications were increased. (Tr. at 609.) On October 9, 2014, PCO2 and PO2 levels were 37.3 and 97.2. (Tr. at 569.) Likewise, the levels on October 12, 2014, were 36.6 and 69.9. (Tr. at 589.)

Claimant returned to Dr. Marzouk on December 9, 2014, with complaints of mild to moderate shortness of breath, associated with wheezing and cough. (Tr. at 709.) Claimant reported that he last smoked six to 12 months ago. (Id.) Physical examination revealed bilateral equal breath sounds, without wheezing or rales. (Tr. at 710.) Dr. Marzouk noted that Claimant's pulmonary function studies showed improvement. (Id.) Chest x-rays showed exacerbation, and therefore, he

started him on steroids and antibiotics. (Id.) The chest x-ray on December 9, 2014, revealed the appearance of chronic interstitial fibrotic changes and noted that the exam was stable. (Tr. at 524-25, 712.) The chest CT scan revealed essentially stable findings. (Tr. at 714.) The pulmonary function studies revealed an FEV1 value of 3.32. (Tr. at 718.)

*Mental Impairments*:

On August 5, 2014, Claimant presented to Logan-Mingo Mental Health on a voluntary basis, with complaints of depression and anger, where he was admitted for one week. (Tr. at 440-42.) Claimant reported that he had learned his 15 year old daughter was in a relationship with a 25 year old man. (Tr. at 440.) Sherry K. Church, M.A., a licensed psychologist, diagnosed major depressive disorder, recurrent, severe with psychotic features; impulsive-control disorder NOS; and assessed a GAF of 61. (Tr. at 442.)

On September 3, 2014, Claimant was admitted voluntarily to Highland Hospital due to suicidal and homicidal thoughts and anger problems. (Tr. at 428-29.) He was diagnosed with major depressive disorder, severe, recurrent without psychosis; impulsive control disorder; and assessed a GAF of 75. (Tr. at 428.) He was discharged on activity as tolerated. (Tr. at 429.) Claimant presented to the Logan-Mingo Area Mental Health, Inc., on September 5, 2014, with complaints of depression and anger, without suicidal or homicidal ideation. (Tr. at 439.) Amber Spaulding, B.A, an Intake Worker, diagnosed Claimant with major depressive disorder, recurrent, severe with psychotic features; impulse-control disorder NOS; and assessed a GAF of 61. (Tr. at 439.) He was directed to return on September 23, 2014, for medication management. (Id.) On September 23, 2014, Claimant was transferred from Logan-Mingo to Three Rivers Medical Center because he was upset about his daughter's relationship with an older man, and reported that he would kill the man. (Tr. at 446-48.) Mental status exam revealed that he was downcast, anxious, angry, frustrated,

and irritable. (Tr. at 447.) Dr. Dilip Chandran, M.D., diagnosed recurrent major depression, severe without psychotic features; generalized anxiety disorder; impulse control disorder; mixed personality traits; and diagnosed a GAF of 25-30. (Tr. at 448.) Upon discharge from Three Rivers on September 29, 2014, it was noted that Claimant was cooperative, had an irritable mood but was able better to control his temper, and denied any suicidal or homicidal thoughts. (Tr. at 507.) His judgment and insight improved, he was sleeping and eating good, and he had a good level of functioning. (Id.)

At a follow-up session at Logan-Mingo on October 7, 2014, Claimant reported that he continued to have anger issues but that he calmed down by drinking beer. (Tr. at 444.) He remained upset about his daughter having a sexual relationship with an older man and stated that he wanted to see the man prosecuted. (Id.) On October 30, 2014, Claimant reported that the man was scheduled to appear in court and that his daughter was staying away from him, but that there was a possibility his daughter was pregnant. (Tr. at 445.) Claimant reported that he no longer had anger issues. (Id.) He indicated that he had "been pretty happy," and drank occasionally. (Id.) Claimant reported good energy, a good and happy mood, and was pleasant. (Tr. at 449.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the Commissioner's decision is not supported by substantial evidence because in relying upon the State agency medical consultants' opinions that he did not meet Listing 3.02, the ALJ failed to consider whether he met Listings 3.02(C)(2) and 3.03B. (Document No. 11 at 9-11.) Specifically, Claimant asserts that the ALJ's reliance on FEV1 values to find that he did not meet or equal a listing impairment was misplaced, demonstrated the ALJ's lack of understanding of his pulmonary fibrosis condition, and excluded consideration of resting arterial blood gas test results. (Id. at 12.) Pursuant to Listing 3.02(C)(2), Claimant contends that his arterial

blood gas test results of PCO2 and PO2 levels on August 19, 2014, satisfied the two required measurements. (Id. at 13.) The ALJ relied upon the opinions of Drs. Osborne and Parikshak to find that Claimant's respiratory problems failed to meet Listing 3.02. (Id.) Claimant asserts however, that subsequent to their opinions, nearly 200 pages of relevant medical evidence was added to the file, which compelled consideration under Listing 3.03B. (Id.) Citing to the medical evidence, Claimant contends that he suffered approximately ten pulmonary fibrosis and COPD exacerbations that required emergency medical intervention and in-patient hospitalizations over a 12-months period from December 2013, through November 2014. (Id. at 14.) Although Listing 3.03B was written for asthma, Claimant contends that his respiratory symptoms and treatment satisfied the listing requirements. (Id. at 16.) The ALJ's failure to consider Listing 3.03B and the corresponding evidence therefore, requires remand. (Id.) Claimant asserts that his respiratory impairments, especially combined with his obesity, at least equaled a combination of Listings 3.02(C)(2) and 3.03B. (Id. at 16-17.)

In response, the Commissioner asserts that contrary to Claimant's allegations, the record failed to contain ample evidence that he met a pulmonary Listing and that the ALJ's step three analysis did not require an "exhaustive point-by-point discussion." (Document No. 12 at 11-12.) Regarding Listing 3.02(C)(2), the Commissioner contends that the medical record did not contain test results equal to or less than the required values. (Id. at 12-13.) Claimant asserts that he met the Listing based on August 19, 2014, PCO2 and PO2 levels of 34.6 and 61.6. (Id. at 13.) The Commissioner asserts however, that the levels must be "equal to or less than" the values set forth in the Listing table. (Id.) With a PCO2 level of 34.6, the table level would be 35, which required a corresponding arterial PO2 level of 60 or less. (Id.) Claimant's PCO2 level was 61.6. (Id.) As such, the Commissioner contends that Claimant failed to meet the table value. (Id.) Additionally, the

Commissioner asserts that the Listing criteria requires measurements on two different occasions and that Claimant's other testing results clearly exceeded the table values. (Id. at 13-14.)

Respecting Listing 3.03B, the Commissioner asserts that Claimant failed to meet the necessary baseline pulmonary testing because he continued smoking. (Id. at 14.) The Commissioner contends that when a claimant continues smoking, he is unable to meet the "in spite of prescribed treatment" criteria of Listing 3.03B. (Id.) The Commissioner notes that the evidence of record clearly demonstrated that Claimant continued to smoke, despite doctors' advice. (Id. at 15.) Although Claimant told Dr. Marzouk, in December 2014, that it had been six to twelve months since he last smoked, the ALJ found the statement lacked credibility, and the Commissioner asserts that the evidence demonstrates to the contrary. (Id.) Finally, the Commissioner notes that Listing 3.03B requires spirometric results between attacks that demonstrated baseline airflow obstruction. (Id. at 16.) She asserts that in June 2014, Claimant had normal spirometry without significant obstruction and normal values in April 2013. (Id.) Accordingly, the Commissioner contends that Claimant fails to demonstrate that he meets or equals Listing 3.03B. (Id.)

Claimant replies that the Commissioner misunderstood his claims to reflect that he met Listing 3.02. (Document No. 13.) Claimant asserts the opposite however, that his impairments equaled a combination of Listings 3.02(C)(2) and 3.03B. (Id. at 1-2.) Claimant asserts that the relevant issue "is that the ALJ failed to recognize that Listing 3.02 was the wrong section to consider at step three *and* to make matters worse, even when improperly considering Listing 3.02, the ALJ looked to the wrong section and evidence in light of [Claimant's] diagnosis of pulmonary fibrosis." (Id. at 2.) Respecting Listing 3.03B, Claimant asserts that the Commissioner provided a *post hoc* rationale because the ALJ failed to consider Listing 3.03. (Id.) Although Claimant continued to smoke, citing Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), he asserts that

the Fourth Circuit acknowledges that smoking can be an involuntary act and that benefits may be denied only when the claimant is able to stop voluntarily. (Id. at 2-3.) In this case, the ALJ found that Claimant continued smoking, but failed to make the preliminary finding that he had the ability to stop on his own. (Id. at 3.) Accordingly, Claimant contends that the ALJ's step three decision is not supported by the substantial evidence. (Id.)

Claimant also alleges that the Commissioner's decision is not supported by substantial evidence because the ALJ failed to obtain an updated medical opinion when nearly 200 additional pages of evidence was received that could have modified the opinions of the State agency medical experts. (Document No. 11 at 17-19.) Consequently, Claimant contends that the record reviewed by Drs. Osborne and Parikshak was not the same record available to the ALJ when he made his findings and issued his decision. (Id. at 18.) At the time of the State agency medical consultants' opinions, Claimant notes that the existence of his mental impairments was not anticipated. (Id.) The additional evidence reflected diagnoses of depressive and impulsive control disorders and a pattern of breathing related attacks and treatment. (Id. at 19.) Furthermore, Claimant asserts that the evidence submitted subsequent to the State agency consultants' opinions reflected exacerbations of his pulmonary impairments which required the administration of IV antibiotics and steroids. (Id.) Claimant contends that these emergency treatments established the pattern of attacks contemplated by Listing 3.03B. (Id.) Claimant therefore contends, that the ALJ's failure to obtain an updated medical opinion and to consider evidence related to his mental impairments, resulted in a step three finding that was not supported by substantial evidence. (Id.)

In response, the Commissioner asserts that Claimant's argument lacks merit and notes that when an ALJ relies upon an opinion prior to the receipt of additional evidence, the appropriate inquiry is to determine whether there was any significant change in the claimant's condition after

the opinion, that reasonably would have affected its validity. (Document No. 12 at 16-17.) Respecting Claimant's pulmonary conditions, the Commissioner asserts that the additional evidence shows that Claimant fails to meet the criteria for either Listing 3.02(C)(2) or 3.03B. (Id. at 17-18.) Regarding Claimant's mental impairments, the Commissioner asserts that the ALJ relied upon the opinions of Drs. Osborne and Parikshak with respect to Claimant's physical condition and not to his mental condition. (Id. at 18.) The ALJ fully considered and reviewed the additional records and assessments of Claimant's mental health condition, which revealed GAF scores of 61 and 75, despite lower scores associated with learning troubling circumstances pertaining to his daughter. (Id.) The ALJ therefore, reasoned that the lower scores were not representative of Claimant's longitudinal status, but rather occurred during an exacerbation period. (Id. at 19.) The ALJ noted that Claimant was able to function on a daily basis and socialize with his family daily. (Id.) In view of Claimant's activities, level of functioning, and the medical records, the Commissioner contends that the ALJ adequately accounted for any possible mental health limitations by restricting him to performing simple, routine, repetitive tasks with frequent contact with supervisors and co-workers, but only occasional contact with the public. (Id.)

Claimant reiterates his earlier arguments in his Reply brief. (Document No. 13 at 3.)

1.  Listing Level Impairments.

Claimant alleges that the ALJ erred in assessing his respiratory impairments under Listing 3.02(C)(2) and 3.03B. (Document No. 11 at 9-17.) The Listing of Impairments describes, for each of the major body systems, impairments that are considered "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education or work experience. 20 C.F.R §§ 404.1525(a); 416.925(a) (2015); see also Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990). Section 3.00 of the Listing of Impairments

15

provides criteria for determining whether an individual is disabled by disorders of the respiratory system. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00 (2015). Section 3.02 deals with chronic pulmonary insufficiency, and the required level of severity for Listing § 3.02(C)(2), chronic impairment of gas exchange due to clinically documented pulmonary disease, is satisfied when the claimant has satisfied the following requirements:

> 2.   Arterial blood gas values of PO2 and simultaneously determined PCO2 measured while at rest (breathing room air, awake and sitting or standing) in a clinically stable condition on at least two occasions, three or more weeks apart within a 6-month period, equal to or less than the values specified in the applicable table III-A or III-B or III-C[.]

Table III-A is applicable to test sites less than 3,000 feet above sea level.

In his decision, the ALJ concluded at step three of the sequential analysis that Claimant's impairments failed to meet Listing 3.02 because the evidence failed to demonstrate FEV1 values that were equal to or less than the values set forth in Table 1 of the Listing. (Tr. at 13.) Although Mr. Braumwell concluded that Claimant's impairments met Listings 3.04B, 3.07B, or 3.03B, the ALJ relied upon the opinions of the State agency medical consultants, Drs. Osborne and Parikshak, and determined that Claimant failed to meet any Listing. (Id.) The undersigned agrees with Claimant that the ALJ failed to consider his impairments specifically under Listings 3.02(C)(2) and 3.03B, but finds that such failure constitutes harmless error. See Dunn v. Colvin,

Respecting Listing 3.02(C)(2), the undersigned finds that the medical record fails to establish test results equal to or less than the values set forth in the Listing table. As the Commissioner points out, Claimant's August 19, 2014, PCO2 and PO2 levels of 34.6 and 61.6, were not less than or equal to the required levels of 35 and 60. Although the PCO2 level was less than 35, the corresponding PO2 level was not less than 60. The undersigned notes that the additional PCO2 and PO2 levels on December 19, 2013, of 39.8 and 62.8, did not correspond to

the table values of 39 and 56. On January 28, 2014, PCO2 and PO2 levels were 37.4 and 79.2, which did not correspond to the table values of 37 and 58. The additional two sets of values in October 2014, also failed to meet the table values. Accordingly, the undersigned finds that despite any error the ALJ may have committed in failing to consider Claimant's respiratory impairments under Listing 3.02(C)(2), such error was harmless.

Section 3.03 deals with asthma, and the required level of severity for Listing 3.03B, asthma attacks, is satisfied when the claimant has satisfied the following requirements:

> B. Attacks (as defined in 3.00C), in spite of prescribed treatment and requiring physician intervention, occurring at least once every 2 months or at least six times a year. Each in-patient hospitalization for longer than 24 hours for control of asthma counts as two attacks, and an evaluation period of at least 12 consecutive months must be used to determine the frequency of attacks.

Asthma attacks are defined under 3.00C, as follows:

> Attacks of asthma, episodes of bronchitis or pneumonia or hemoptysis (more than blood-streaked sputum) or respiratory failure as referred to in paragraph B of 3.03, 3.04, and 3.07, are defined as prolonged symptomatic episodes lasting one or more days and requiring intensive treatment, such as intravenous bronchodilator or antibiotic administration or prolonged inhalational bronchodilator therapy in a hospital, emergency room or equivalent setting. Hospital admissions are defined as inpatient hospitalizations for longer than 24 hours. The medical evidence must also include information documenting adherence to a prescribed regimen of treatment as well as the medical evidence should include spirometric results obtained between attacks that document the presence of baseline airflow obstruction.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 3.00C (2015).

The Commissioner contends that Claimant is unable to meet Listing 3.03B, because he continued smoking despite doctors' advice. (Document No. 12 at 15.) Although his physician specifically told him that his lung condition would only get worse if he continued smoking, Claimant continued smoking nevertheless. (Id.) Citing Dunn v. Colvin, 2014 WL 4702230, at *2-3 (S.D. Miss. 9th Cir. 2005), the Commissioner therefore, contends that Claimant is unable to meet the "in spite of

prescribed treatment" requirement of Listing 3.03B. (Id.) Citing Gordon v. Schweiker, 725 F.2d 231, 236 (4th Cir. 1984), Claimant contends that the Commissioner may deny benefits because of tobacco abuse, only if he finds that a physician prescribed that the claimant cease smoking and the claimant is able to stop voluntarily. (Document No. 13 at 2.) Claimant asserts that the ALJ failed to determine whether Claimant was able to stop smoking voluntarily. (Id. at 3.)

In Gordon, 725 F.2d at 236, the Fourth Circuit acknowledged that benefits may be denied when a claimant "unjustifiably refuses treatment." (citing 20 C.F.R. § 404.1530(b)). The Court held that when a claimant is addicted to and abusing alcohol, "benefits cannot be denied because of a claimant's continued alcohol abuse if the claimant is unable voluntarily to stop drinking." Id. The Court further stated:

> Failure to quit smoking has been held to be a justifiable ground for refusing benefits. E.g., Henry v. Gardner, 381 F.2d 191 (6th Cir. 1967); Hirst v. Gardner, 365 F.2d 125 (7th Cir. 1966). However, some recent cases have held that benefits cannot be denied for failure to stop smoking absent a finding that the claimant could voluntarily stop smoking (i.e., was not addicted to cigarettes). Monteer v. Schweiker, 551 F.Supp. 384, 390 (W.D. Mo. 1982); Caprin v. Harris, 511 F.Supp. 589, 590 (N.D. N.Y. 1981). Smoking, like alcohol abuse, can be an involuntary act for some persons. We believe that allegations of tobacco abuse should be treated in the same fashion as allegations of alcohol abuse. …The Secretary may only deny benefits because of alcohol or tobacco abuse if she finds that a physician has prescribed that the claimant stop smoking or drinking and the claimant is able voluntarily to stop.

Gordon, 725 F.2d at, *236. Thus, pursuant to the holding in Gordon, the Commissioner may not deny benefits based on tobacco abuse unless the ALJ finds that a physician has prescribed that the claimant cease smoking and that the claimant is able to stop smoking voluntarily. The ALJ may however, consider evidence of a claimant's failure to stop smoking as prescribed, in assessing the claimant's credibility. See e.g., Hampton, 2015 WL 5304294, *27. In this case, the ALJ failed to make the requisite finding at Step 3 of the sequential analysis, which resulted in a denial of benefits. The ALJ did not specifically consider Listing 3.03B, and therefore, failed to make such a finding, but found in error, that Claimant did not meet a Listing level impairment.

Nevertheless, Listing 3.03B also requires that Claimant demonstrate "spirometric results obtained between attacks that document the presence of baseline airflow obstruction." As the Commissioner emphasizes, the evidence demonstrates normal spirometry results between exacerbations of Claimant's pulmonary impairments. Respiratory testing results in April 2013, and June 2014, were normal. Accordingly, although the record fails to establish that Claimant was able to stop smoking voluntarily, it clearly demonstrates that he failed to meet the requisite spirometry results of Listing 3.03B. Accordingly, the undersigned finds that the ALJ's failure to consider specifically Listing 3.03B, to the extent that it was error, is harmless. Although Claimant asserts that his impairments in combination meet a Listing level impairment, the undersigned finds that he is unable to meet or equal, singly or in combination, any pulmonary listing level impairment. Accordingly, the undersigned finds that the ALJ's step three decision is supported by substantial evidence.

2. Updated Medical Opinion.

Claimant also alleges that the ALJ erred in failing to obtain an updated medical opinion from a consultant to evaluate the evidence submitted after the opinions of the State agency medical consultants. (Document No. 11 at 17-19.) In Cook v. Heckler, 783 F.2d 1168, 1173 (4th Cir. 1986), the Fourth Circuit noted that an ALJ has a "responsibility to help develop the evidence." The Court stated that "[t]his circuit has held that the ALJ has a duty to explore all relevant facts and inquire into the issues necessary for adequate development of the record, and cannot rely on evidence submitted by the claimant when that evidence is inadequate." Id. The Court explained that the ALJ's failure to ask further questions and to demand the production of further evidence about the claimant's arthritis claim, in order to determine if it met the requirements in the listings of impairments, amounted to a neglect of his duty to develop the evidence. Id.

It is nevertheless Claimant's responsibility to prove to the Commissioner that he is disabled.   20 C.F.R. §§ 404.1512(a), 416.912(a) (stating that "in general, you have to prove to us that you are blind or disabled. This means that you must furnish medical and other evidence that we can use to reach conclusions about your medical impairment(s).") Thus, the claimant is responsible for providing medical evidence to the Commissioner showing that he has an impairment.   Id. §§ 404.1512(c), 416.912(c). The Regulations provide that: "You must provide medical evidence showing that you have an impairment(s) and how severe it is during the time you say that you are disabled." §§ 404.1512 (c), 416.912(c).   In Bowen v. Yuckert, 482 U.S. 137, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987), the Supreme Court noted:

> The severity regulation does not change the settled allocation of burdens of proof in disability proceedings.   It is true . . . that the Secretary bears the burden of proof at step five . . . [b]ut the Secretary is required to bear this burden only if the sequential evaluation process proceeds to the fifth step.   The claimant first must bear the burden . . . of showing that . . . he has a medically severe impairment or combination of impairments . . . .   If the process ends at step two, the burden of proof never shifts to the Secretary.   . . .   It is not unreasonable to require the claimant, who is in a better position to provide information about his own medical condition, to do so.

Bowen v. Yuckert, 482 U.S. at 146, n. 5; 107 S.Ct. at 2294, n. 5 (1987). Thus, although the ALJ has a duty to develop the record fully and fairly, he is not required to act as the claimant's counsel. Clark v. Shalala, 28 F.3d 828, 830-31 (8th Cir. 1994). Claimant bears the burden of establishing a prima facie entitlement to benefits.   See Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); 42 U.S.C.A. § 423(d)(5)(A)("An individual shall not be considered to be under a disability unless he furnishes such medical and other evidence of the existence thereof as the Commissioner of Social Security may require.")   Similarly, Claimant "bears the risk of non-persuasion." Seacrist v. Weinberger, 538 F.2d 1054, 1056 (4th Cir. 1976).

This District Court held in Hampton v. Colvin, 2015 WL 5304294, at *22 (S.D. W.Va. Aug. 17, 2015)(M.J. Eifert), that the Regulations "impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where 'additional medical evidence is received that in the opinion of the [ALJ]…may change the State agency medical…consultant's finding'…is an update to the report required." Id. (quoting Chandler v. Commissioner of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011)).

Claimant contends that after Drs. Osborne and Perikshak rendered their opinions, approximately 200 pages of additional medical evidence was added to the file that could have changed their opinions. Claimant argues that the evidence of his mental impairments was not in evidence prior to the State agency medical consultants' opinions. (Document No. 11 at 19.) As the Commissioner points out, the ALJ did not rely upon the opinions of Drs. Osborne and Parikshak as to Claimant's mental condition. Their opinions solely were based on Claimant's physical abilities. In his decision, the ALJ acknowledged the absence of a mental RFC assessment or psychiatric review technique. (Tr. at 19.) Nevertheless, the ALJ accommodated limitations arising from Claimant's mental impairments by limiting him to performing simple, routine, and repetitive tasks, with frequent contact with supervisors and co-workers and occasional contact with the public. (Tr. at 15, 19.) The ALJ acknowledged that Claimant was assessed a GAF score of 75 upon discharge from Highland Hospital in September 2014, which was indicative of only transient and expectable reactions to psychological stressors. (Tr. at 19.) At that time, Claimant experienced psychosocial stressors that stemmed from the separation from his wife. (Id.) The ALJ gave partial weight to the GAF score because it explained why Claimant was having mental health deterioration. (Id.) The ALJ then acknowledged that three days later, Claimant was assessed with

a GAF score of 61, which was indicative of only mild symptoms. (Id.) Again, the ALJ gave this score partial weight as it reflected that Claimant was dealing with issues regarding his 15 year old daughter's relationship with an older man. (Id.) Finally, the ALJ acknowledged that he was assessed a GAF score of 25-30 in late September 2014, when he was admitted, but gave little weight to the score as it was assessed during an exacerbation and did not reflect Claimant's longitudinal mental status. (Id.) As the Commissioner notes, subsequent therapy notes reflected that Claimant's mood subsequently elevated to "happy." Thus, the GAF scores were an indication of specific moments in time and were not reflective of Claimant's longitudinal mental status.

The ALJ also acknowledged Claimant's subjective reports and found that he had only mild restrictions in daily activities; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and no episodes decompensation of extended duration. (Tr. at 14.) Accordingly, in view of the foregoing, the undersigned finds that the ALJ properly considered all the evidence of record as it pertained to Claimant's mental impairments and adequately assessed all resulting limitations. The undersigned further finds because the ALJ's decision was based on the substantial evidence of record, there was no need for an updated opinion regarding his mental impairments.

Respecting Claimant's pulmonary impairments, the undersigned finds that the ALJ considered all the evidence of record and properly relied on the opinions of Drs. Osborne and Parikshak. Claimant argues that the evidence submitted after the State agency consultants' opinions, demonstrates a pattern of attacks and requisite blood levels to meet Listings 3.02(C)(2) and 3.03(B). As discussed above, the medical evidence failed to demonstrate that Claimant met a Listing level impairment, and therefore, an updated opinion would not have changed the ALJ's

decision. Accordingly, the undersigned finds that the ALJ's reliance upon the opinions of Drs. Osborne and Parikshak was proper and that his decision was supported by substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727

F.2d 91, 94 (4th Cir.), <u>cert. denied</u>, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: June 7, 2016.

Omar J. Aboulhosn
United States Magistrate Judge